Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (*pro hac vice* forthcoming)*
nicolec@salahilaw.com
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352
* Admitted to practice in Pennsylvania only

Amria Ahmed (SBN 263389)
amria@araborganizing.org
Arab Resource and Organizing Center
522 Valencia St.
San Francisco, CA 94110
Tel: (415) 861-7444

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **HAMAD SAYAD**, | Case No. 3:25-cv-4679 |
| *Plaintiff*, | |
| *v.* | |
| **UNITED STATES OF AMERICA**, | |
| *Defendant*. | |

## I.  INTRODUCTION

1.      Hamad Moshen Thabit Saad Sayad is a Yemeni citizen who fled Houthi persecution in January 2020.  He entered the United States in December of 2020 and was in Immigration and Customs Enforcement (ICE) detention until May 6, 2022, while his applications for asylum and Temporary Protected Status were pending.  Mr. Sayad was primarily detained at La Palma Correctional Center (LPCC), a facility owned by CoreCivic which, at the time, was under contract with ICE.

2.      During Mr. Sayad's detention, CoreCivic and ICE officials discriminated against him by confiscating items necessary to practice his religion, improperly changing his detainee security status because of his religious expression, moving him to an inappropriate and unwarranted housing accommodation on that basis, and retaliating against him when he protested this discrimination.  ICE failed to provide any documentation supporting the decision to reclassify Mr. Sayad, never gave him an opportunity to appeal his classification or his placement in solitary confinement, and never returned his belongings.

3.      Feeling that he had no other way to improve his living situation, Mr. Sayad went on hunger strike in January 2022.  After Mr. Sayad broke his strike two months later, ICE negligently failed to ensure that he received adequate medical care.  ICE officials and facility personnel negligently failed to follow a medically appropriate refeeding plan.  ICE employees, against ICE's own policies, did not ensure that refeeding would occur at a medical facility that was equipped to monitor Mr. Sayad's fragile condition, or that the facility followed the standard of care for reintroducing food after a period of prolonged starvation.  Ultimately, ICE, through its employees and through CoreCivic alike, pressured and threatened Mr. Sayad to eat solid food before he felt that he could, and ultimately attempted a medically unnecessary and highly traumatic insertion of a nasogastric tube that caused lasting physical and emotional injuries to Mr. Sayad, and put his life at risk.

4.      Mr. Sayad brings this claim against the United States under the Federal Tort Claims Act for the acts and omissions of its employees, including for: negligence, negligent

infliction of emotional distress, negligent supervision, false imprisonment, abuse of process, and intentional infliction of emotional distress.

## II.    PARTIES

5.    Plaintiff Hamad Moshen Thabit Saad Sayad is a 29-year-old man who arrived in the United States in December of 2020 after fleeing Houthi persecution in Yemen.  Mr. Sayad was detained in ICE custody upon his arrival until his release on May 6, 2022.  He currently resides in the San Francisco Bay Area.

6.    Defendant United States of America is sued under the Federal Tort Claims Act (FTCA) for the tortious acts and omissions of its employees, including employees of U.S. Immigration and Customs Enforcement (ICE), a law enforcement agency within the Department of Homeland Security (DHS).

## III.    JURISDICTION AND VENUE

7.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

8.    Venue is proper under 28 U.S.C. §§ 1402(b) and 1391(e)(1) because Plaintiff resides in the Northern District of California, and no real property is involved in this action.

## IV.    FACTUAL ALLEGATIONS

### A.    ICE officials placed Mr. Sayad at La Palma Correctional Center, a facility with a history of violence and excessive use of force against detainees.

9.    ICE apprehends, detains, and removes noncitizens who it determines do not have a lawful basis to remain in the country.  ICE Enforcement and Removal Operations is the division within ICE that is charged with overseeing and managing the detention facilities that house these detained noncitizens while their claims to remain in the country are resolved. Immigration detention is civil in nature and non-punitive.

10.    ICE owns several detention facilities, but it also contracts with privately owned facilities.  When it contracts with privately-owned facilities, ICE Enforcement and Removal Operations retains a contractual duty to supervise the facilities' operations to ensure that the facility complies with ICE's detention standards.  Specifically, ICE requires its contracting facilities to comply with its Performance Based National Detention Standards, a series of

mandatory, non-discretionary policies relating to detention conditions, facility operations, and medical care for detained individuals. Detainees are entitled to treatment that conforms to these requirements.

11. LPCC is a privately owned detention facility that used to have a contract with ICE Enforcement and Removal Operations to house immigration detainees. LPCC is owned by CoreCivic, an entity that owns approximately 81 detention facilities across the United States and has a wide range of government clients, providing both immigration and correctional detention services.

12. LPCC began housing ICE detainees in 2018, and at some point, in 2022, began winding down its operations with ICE and slowly moved detainees to a neighboring facility, Eloy Detention Center. LPCC no longer provides detention services to ICE Enforcement and Removal Operations.

13. While LPCC is owned by CoreCivic, ICE employees maintained an active role in supervising and setting the terms of confinement for ICE detainees when they were housed there. ICE had an onsite presence at LPCC when it housed ICE detainees, and according to CoreCivic's website, CoreCivic provides government employees "unfettered access at all times to our facilities, our staff and the people they entrust to our care."

14. This oversight structure was borne out in Mr. Sayad's experience being detained at LPCC. While he was detained there, ICE officers would regularly roam the facilities' halls to supervise, discipline, investigate, confiscate items, and arrest detainees. ICE officers were also easily identifiable, as CoreCivic employees wore shirts that bore the CoreCivic logo, while ICE officers wore law-enforcement like uniforms and frequently announced that they were ICE officers.

15. ICE employees also had an active role in supervising the quality of healthcare provided to ICE detainees at LPCC. When a facility is privately owned and under contract with ICE, ICE Health Services Corp retains the duty to supervise the provision of healthcare to ICE detainees.

16.     Upon information and belief, ICE Health Services Corp employees had an active role in supervising and/or providing the medical care to Mr. Sayad during the period relevant to this complaint, between January 2022 and March 2022.

17.     LPCC had a history of noncompliance with ICE detention standards.  In March 2021, one year before the incidents giving rise to the present complaint, DHS's Office of Inspector General published the results of an audit at LPCC, which identified violations of ICE detention standards that threatened the "health, safety, and rights" of detainees.  *See* Dep't. of Homeland Security, Off. of the Inspector General, *Violations of Detention Standards amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ*, at 4 (March 30, 2021) (hereinafter "OIG Report").

18.     Of note, the OIG report found that LPCC did not give timely responses to most detainee grievances and, in some cases, did not respond to the detainees' grievances at all.  OIG Report at 13.

19.     The OIG Report also found deficiencies in staff-detainee communication practices, with LPCC failing to keep records of detainee requests, and ICE failing to provide a Deportation Officer visit or call schedule for detainees.  OIG Report at 15.

20.     The OIG Report also found that detainees in administrative segregation did not receive required services and privileges under ICE policy.  Specifically, all detainees in administrative segregation were found to have been denied required access to laundry for soiled bedding and clothing, access to legal materials, and access to haircuts, at times were denied recreational time outside of their cells, and did not have access to the commissary.  OIG Report at 11.

21.     Finally, the OIG Report noted serious allegations of excessive use of force and general mistreatment and abuse, including the improper use of chemical agents to quash peaceful protest and punishing peaceful, protesting detainees with lengthy stays in segregation.  The report also noted several instances of verbal abuse and bullying by officers in the facility, with one substantiated grievance finding that an officer "used profane and abusive language to

ridicule a detainee" and another "cursed at a detainee, called him a racial slur, threatened him with pepper spray, and hung up his telephone call with family." OIG Report at 6.

22. ICE employees, including supervising officers and healthcare professionals, were aware of LPCC's record in abusing detainees, improperly punishing them for engaging in protected conduct, failing to communicate with them in a manner that comported with due process and ICE policy, and providing inadequate healthcare.

23. The OIG Report documents ICE's pattern of failing to adequately supervise LPCC personnel to ensure that they abided by ICE's detention standards.

24. Mr. Sayad's experience in detention at LPCC aligned with this well-documented history.

**B.    ICE officials reclassified Mr. Sayad as a "high class" detainee in retaliation for his religious observance.**

25. Mr. Sayad's custodial status (that is, whether he would be detained or released) and his security status within detention (*i.e.*, medium or high security) changed at various times with little warning, and at best, shifting, pretextual explanations from ICE.

26. These classification decisions did not occur in a vacuum—they occurred against a backdrop of conflict surrounding Mr. Sayad's religious observance and amounted to discrimination and retaliation for practicing his faith.

27. Mr. Sayad entered the United States on or around December 15, 2020; and was detained at LPCC shortly thereafter, on or around December 16, 2020. On January 8, 2021, Mr. Sayad received a notice of custody determination that indicated that he would be released. Yet, merely five days later, Mr. Sayad received a similar notice indicating that he would *not* be released, yet it made no mention of the prior notice and provided no explanation for the change in his status. This sudden, inexplicable shift in his status caused Mr. Sayad significant distress and confusion and marked the beginning of ICE's parade of failures to communicate with Mr. Sayad about his status and the conditions of his confinement.

28. Mr. Sayad remained in detention at LPCC for the following year while he worked with his immigration attorneys to obtain legal status and release. He spent the majority of his

time in detention in the "Charlie" pod, a low-security status where he was housed with other similarly situated detainees. Detainees' uniforms in this general population pod were all the same color, with each cell housing two detained individuals.

29. A devout Muslim, Mr. Sayad prayed five times a day during his detention, as required by his faith. On or around January 18, 2022, Mr. Sayad was assigned a new cellmate who reportedly complained that Mr. Sayad's fajr prayer (an early-morning prayer that must take place between dawn and sunrise for many observant Muslims) was bothering him. The cellmate then complained about the early morning prayer to the supervising officer, a CoreCivic employee known as Officer Glass. Officer Glass berated Mr. Sayad, asking if he had to pray and read the Quran "every day," and confiscated Mr. Sayad's Quran and prayer mat—two items that he considered necessary for his daily prayers. Mr. Sayad became very upset over this treatment and requested that he be moved to a different cell where he could be alone and not bother anyone, and to speak with Officer Glass's supervisor. The Officer responded by threatening Mr. Sayad, saying that she would take him somewhere where nobody could find him. Mr. Sayad requested and was denied an interpreter during this encounter with Officer Glass.

30. The following day, the same officer told Mr. Sayad to gather his belongings and took him to the facility's laundry room, where she told him to undress, change into a different color uniform, and to sign papers that were in English and that he did not understand. Mr. Sayad was, once again, denied an interpreter, and refused to sign the papers. He was never given a copy of these documents and still does not know what they stated or their subject matter.

31. Following this interaction in the laundry room, Mr. Sayad was taken to the medical unit, and the conditions of his confinement changed drastically with no explanation. He was separated from the rest of his pod, placed functionally in solitary confinement, and had heightened security surveillance over him. Multiple guards would escort him when his attorney would visit and when he would be transported out of his cell. He had little to no interaction with others.

32. At no point did ICE attempt to explain why he had been moved, or that anything relating to his security classification had changed. Mr. Sayad nonetheless understood that these

two events were related—that his solitary confinement in the medical unit was a result of the exchange he had with Officer Glass concerning his morning prayers, and her decision to confiscate his prayer rug and Quran.  Believing that this change in his classification was because of his religion, and feeling he had no other way to protest the conditions of his confinement, Mr. Sayad refused to eat and announced that he would be on a hunger strike until ICE returned him to his regular general population housing pod.

33.     ICE offered inconsistent and shifting explanations for why it moved Mr. Sayad to the medical unit.  Medical records show that Mr. Sayad was moved from general population to the medical unit for security reasons, not medical reasons.  Yet, in early February 2022, when ICE was seeking Court authorization to force-feed Mr. Sayad, ICE asserted that his entire pod was placed on "cohort status" following a COVID-19 exposure.  "Cohort status" ostensibly restricted ICE's ability to re-house or transfer detainees.

34.     ICE filings offer different dates for when Mr. Sayad's pod entered "cohort status," at one point saying the pod entered this status on January 17, and at other times, saying the pod entered this status on January 23, after Mr. Sayad had already been in the medical unit for four days.

35.     In a sworn statement in the action to force-feed Mr. Sayad, the ICE Officer in Charge at LPCC claimed that ICE reclassified Mr. Sayad on January 19, while his pod was in "cohort status," but because there were no housing units available for "high class" detainees, Mr. Sayad was moved to the medical unit.  Contemporaneous medical records contain no such information about Mr. Sayad's pod being in "cohort status," only that he was housed in the medical unit for security reasons.  At the end of this supposed "cohort status" period, Mr. Sayad tested positive for COVID-19, which ICE claims delayed any release from the medical unit into general population.

36.     Yet, when Mr. Sayad's then-counsel separately sought an explanation of why his security status changed, ICE deportation officer Christopher N. Miller sent her an email saying that Mr. Sayad's security status had changed in July 2021, six months before he was moved.  Mr.

Miller claimed that ICE and/or LPCC officers "missed" the reclassification and only acted on it when they rediscovered it on January 19, 2022.

37. According to Mr. Miller's version of events, the day after the above-mentioned incident between Mr. Sayad, his cellmate, and Officer Glass took place over prayers, ICE supposedly realized that Mr. Sayad should have been in maximum security status for the prior six months, even though Mr. Sayad had lived in low security conditions for the prior year with little incident. Mr. Miller did not provide Mr. Sayad's then-counsel with any documentation or other objective basis for the change in Mr. Sayad's security status.

38. Following the act of religious discrimination and his move to solitary confinement in the medical unit, Mr. Sayad repeatedly told CoreCivic and ICE employees that he was on hunger strike because of a discriminatory change in his classification, the conditions of his confinement, and the seizure of his religious items. Despite his repeated efforts to be heard, ICE never explained the reasons for his reclassification to him or offered any mechanism to challenge it.

39. ICE had every opportunity to reverse course, but instead, it doubled down, refused to provide any objective documentation supporting the decision to reclassify Mr. Sayad, and as a result eroded his trust in the medical personnel charged with caring for him and needlessly prolonged Mr. Sayad's hunger strike.

**C.** **ICE failed to follow medical guidelines in administering medical care to Mr. Sayad after he broke his hunger strike.**

40. While LPCC was owned and operated by CoreCivic, a private company, ICE officials regularly roamed the halls at LPCC and were easily identifiable by their uniforms. ICE officials would regularly meet with Mr. Sayad to try to coerce him into breaking his hunger strike without having any intention of changing Mr. Sayad's living conditions or addressing the discrimination that prompted Mr. Sayad's hunger strike in the first place. On January 23, 2022, Mr. Sayad was induced to eat a meal because ICE employees told him he would be returned to general population housing if he ate. But ICE did not reclassify him or move him after he ate this meal, further eroding his trust in facility officials.

41.      At other times, ICE officials confiscated Mr. Sayad's personal items and turned the water off in his cell, which he needed to shower before his daily prayers.  ICE officials directly tied these actions to Mr. Sayad's hunger strike and told him that he would get the water turned on in his cell and his items returned to him if he ate.  ICE officials were told by Mr. Sayad and his then-counsel that these conditions inhibited his religious practice, eroded Mr. Sayad's trust in medical personnel, and that they constituted religious discrimination and retaliation for protected speech.  Nonetheless, most of his items were never returned to him.

42.      ICE officials also subjected Mr. Sayad to extensive medical monitoring and intervention without his consent.  Mr. Sayad speaks and understands only basic English and does not understand English well enough to have a conversation concerning his medical care without the use of an interpreter.  Yet, ICE and CoreCivic employees routinely departed from medical best practices by refusing to provide oral interpretation services to Mr. Sayad when they were communicating with him about his hunger strike.  For example, they often insisted that he could understand and communicate when he could not, and subjected him to medical intervention when he did not understand what was happening.  ICE and CoreCivic employees chose to interpret Mr. Sayad's confusion as disobedience and failed to provide Mr. Sayad the dignity of explaining himself and making informed choices concerning his body.

43.      On February 18, 2022, ICE sued Mr. Sayad in the District Court of Arizona, seeking injunctive relief to allow the government to administer involuntary medical care to Mr. Sayad.  *See United States v. Sayad*, Case No. 2:22-cv-00270-DLR (D. Ariz.).   On the same day, the Government obtained a temporary restraining order ("TRO") to administer involuntary hydration and medical examinations "through competent medical personnel." *Id.*, ECF No. 6. On March 11, 2022, the TRO was amended to allow the government to administer involuntary nutrition, again, through competent medical personnel. *Id.*, ECF No. 37.

44.      On March 12, 2022, the day after the Arizona federal court amended the TRO to allow the government to administer involuntary nutrition, medical records indicate that Mr. Sayad had decided to end his hunger strike.  He was hospitalized at the time and had a PICC line (a Peripherally Inserted Central Catheter) inserted into his arm.  After ICE obtained the order,

ICE officers went into his hospital room and showed him a graphic video of a forcible nasogastric tube insertion, and threatened that they would subject him to that exact procedure if he did not eat. Hamad was terrified of the prospect of having this procedure performed on him, and had asked if there would be any pain management as part of the insertion of the nasogastric tube. After being informed that there would not be, he "voiced he does not want to hurt anymore and agreed to drink" the liquid formula mixture offered to him.

45.    Over the following days, Mr. Sayad had been slowly trying to reintroduce his body to food, but it was proving difficult for him. He could only consume warm liquids, and any acidic liquids burned his esophagus. He was also experiencing sharp abdominal pain, indigestion, and tightness in his chest. This tightness made him feel like he was going to choke on his food, as if the food would get stuck in his chest and not move into his digestive system. He nonetheless persisted because he wanted to avoid a nasogastric tube insertion, which he knew would be very painful.

46.    Despite Mr. Sayad's efforts at trying to eat and consistent, yet gradual, weight gain, ICE officers and CoreCivic employees, under ICE's supervision and with ICE's acquiescence, continued to push Mr. Sayad to eat greater volumes of food before he felt ready, imposed arbitrary time limits on the amount of time he would have to eat the food, and insisted that he progress from liquid to solid foods in the span of only a few days. Any time Mr. Sayad hesitated or tried to explain that he felt that he could not consume the food in front of him, medical personnel would choose to interpret his hesitation as defiance, deny him an interpreter, and threaten him with the possibility of a forced, unmedicated, nasogastric tube insertion.

47.    Indeed, at least twice, Dr. David Robertson, Chief Medical Officer at LPCC, noted in charts that Mr. Sayad was to be given "ONE HOUR" (emphasis in original) to finish his meals, stating "this is reasonable" without offering any explanation. Medical records indicate that staff "repeatedly" told Mr. Sayad to keep drinking, and they frequently reminded him of the court order and that he might be force-fed.

48.    This treatment violated medical guidelines and scientific consensus. Refeeding after periods of prolonged starvation must be very gradual, and allowed to go at the patient's

pace, with the standard practice being to administer frequent, very small amounts of nutrition to help the stomach adjust.  And while a liquid diet is not preferred in the long-term, liquid diets are medically appropriate in the weeks following a period of prolonged starvation.  On the other hand, eating too much at once can cause significant discomfort, dangerous electrolyte imbalances and intestinal problems, and can raise the risk of refeeding syndrome, a potentially life-threatening condition.

49.     Refeeding after periods of prolonged starvation should also take place under close medical supervision, with regular laboratory tests to check for electrolyte balances, and with the support of a dietician to provide balanced nutrition to often fragile patients.  LPCC lacked this critical infrastructure, did not conduct regular laboratory tests of Mr. Sayad's electrolyte levels, and based Mr. Sayad's refeeding protocol on diluted nutritional supplements and arbitrary, rigid claims for what would be "reasonable" times to reintroduce certain foods.  At no point do any of Mr. Sayad's medical records indicate that ICE or any CoreCivic employee consulted with a dietitian or other competent refeeding professional about reintroducing him to eating food after his strike.

50.     On March 16, 2022, Dr. Robertson inexplicably demanded that Mr. Sayad needed to transition to eating solid food that day—just four days after Mr. Sayad had begun accepting liquid nutrition after a hunger strike that lasted around two months.  Mr. Sayad, not feeling well from his dinner the night before, asked if he could eat the food later in the day.  Dr. Robertson got angry, hit the table, and demanded that Mr. Sayad eat what was in front of him, and then threatened to use the court order to place the nasogastric tube.  Dr. Robertson then left the room, and two hours later an assistant asked Mr. Sayad if he intended to eat the food in front of him or not.  Mr. Sayad asked for an interpreter, and he was told that he did not need an interpreter for a "yes or no" question.  Mr. Sayad was trying to explain that he would be willing to drink liquids, or eat pureed foods, but he could not swallow solid food at that time.

51.     The assistant spoke with another female staff member, and brought over several security officers, with one of them holding a camera and recording Mr. Sayad.  Mr. Sayad pleaded with them to provide an interpreter, as the security officers moved to hold him down.

There were approximately six officers holding him down, two medical assistants, 2 nurses, and a cameraman present as they began attempting to force a nasogastric tube up Mr. Sayad's nose. Mr. Sayad weighed 143 pounds at the time. Mr. Sayad believes that the officers who forcibly held him down were ICE personnel.

52. A nasogastric tube insertion is extremely painful, with patients rating the procedure as more painful than having a broken bone pulled back into place. Many consider it to be a form of torture when performed on prisoners on hunger strike. *See*, *e.g.*, Aviva Stahl, *When Force-Feeding Is Torture* (Mar. 8, 2023), https://www.thenation.com/article/society/force-feeding-torture-prison-video/. It requires pushing a plastic tube up the patient's nose and down their throat into their stomach, triggering both cough and gag reflexes at the same time. It also comes with a risk of complications, including misplacement (if the tube enters the trachea and lungs rather than the esophagus), trauma in the nasal passage or throat, including bleeding, and other gastric complications.

53. Staff at LPCC attempted to insert the tube five times into Mr. Sayad's nose— three times in the left nostril and twice in the right nostril. Each time the tube would be forcibly shoved up Mr. Sayad's nostrils, the tube would be forced out of Mr. Sayad's mouth instead of into his throat. When the tube would come into Mr. Sayad's mouth, staff would quickly yank the tube out of Mr. Sayad's nose, causing sharp pain and profuse bleeding out of his nose and mouth, which streamed onto towels, and eventually his shirt. During the procedure Mr. Sayad lost sensation in his hands.

54. After the fifth attempt, an officer yelled that Mr. Sayad seemed to be suffering a stroke, and the officer recording the procedure abruptly stopped filming. Nurses put what seemed like a blood pressure cuff around Mr. Sayad's arms and asked him again if he would eat. He said yes.

55. Mr. Sayad describes the pain of this procedure and the injuries caused to him as unbearable.

56. The violence of the procedure caused Mr. Sayad's PICC line to be pulled back, and the next day Mr. Sayad complained that he could not move the fingers on his left hand.

Instead of quickly evaluating Mr. Sayad for possible nerve damage or another significant, potentially life-threatening neurological event, staff wrote in his records that he seemed able to move both hands, demonstrated no hurry in diagnosing Mr. Sayad, and indeed waited four days to place a non-urgent referral for a neurologist to evaluate it.

57.    Since that day, Mr. Sayad has lost nearly all his function in his left hand and has been told that he will need a surgery in his elbow to restore nerve function, as well as months of physical therapy.

58.    The government only had the authorization to administer involuntary nutrition to Mr. Sayad as a lifesaving measure and should have ensured that it remained a last resort.  The government exceeded that authority by authorizing medical personnel to administer involuntary nutrition with incompetent personnel.  Further, the tube insertion, apart from being cruel, was not medically necessary, as Mr. Sayad had been steadily gaining weight, was willing to consume liquids and pureed foods, and had only been eating for fewer than five days.  Alternative, less painful, and less invasive methods to provide nutrition were available, if additional nutrition beyond what Mr. Sayad was already consuming were necessary.  On the other hand, the nasogastric tube would have administered only liquid nutrition to Mr. Sayad's stomach, not advancing Mr. Sayad's refeeding in any way.  It was thus punitive and retaliatory in nature rather than medically appropriate.

59.    On March 22, 2022, merely eleven days after Mr. Sayad broke his hunger strike, and less than a week after the botched attempt at inserting a feeding tube, ICE transferred Mr. Sayad to a different detention facility in Arizona, the Eloy Detention Center (EDC).  Like LPCC, EDC also lacked the ability to provide same-day laboratory testing to supervise Mr. Sayad's electrolyte levels, and did not have a dietician on staff to supervise Mr. Sayad's continued reintroduction to consuming food.

60.    To add insult to injury, ICE transferred Mr. Sayad to EDC without first confirming that the facility would be able to continue providing Mr. Sayad with the liquid diet that he had been consuming at LPCC, functionally requiring him to go back to eating solid foods immediately, even though it was still unsafe and painful for Mr. Sayad to do so.  Mr. Sayad was

unable to adjust to this sudden shift, and feeling he had no other choice, resumed refusing food. Eloy reinstated the hunger striking protocol for Mr. Sayad.

61.     Mr. Sayad continued to receive inappropriate medical care for his condition until ICE Health Services Corp transferred Mr. Sayad to Krome Detention Center in Miami, a facility owned by ICE, where he eventually broke his hunger strike and was later returned to regular housing.

62.     Mr. Sayad experiences intense trauma from his treatment in the medical unit at LPCC and Eloy, which manifests in severe emotional disturbance, memory problems, and a stammer.  Mr. Sayad reports being afraid to go on walks or leave the house, and that the memory of the force-feeding haunts him.  He constantly worries about being re-subjected to the procedure and other mistreatment by ICE officials.

63.     Mr. Sayad has not been able to speak in the same way he did before his detention and hunger strike and is now being medicated for various ailments because of these incidents. He has also spoken less frequently with his family since his release from detention, because he does not want to worry them with how he looks and speaks, sometimes even attributing the stammer in his voice to poor internet connection.  This means he rarely speaks with his mother, as he is worried that her health would decline upon hearing about the gravity of his injuries. Indeed, while he was detained, his family in Yemen learned about the hunger strike and the injuries he sustained.  Mr. Sayad's mother was ultimately hospitalized from the shock and stress at the news that her youngest son had possibly suffered a stroke while in ICE detention.

64.     Mr. Sayad is also suffering from various physical injuries stemming from the botched force-feeding attempt and his confinement in the medical unit.  Most notably, Mr. Sayad has extremely limited use of his left hand— his middle, ring, and pinky fingers are completely paralyzed and curled into a tight fist position.  This injury reduces his quality of life, and he has experienced bullying as a result.  He also suffers from severe nerve pain, rheumatism, lower back pain, chest pain, and chronic insomnia from the abuses he endured in the medical unit.

**D.      Mr. Sayad has exhausted his administrative remedies under the Federal Tort Claims Act.**

65.      The United States is liable pursuant to the Federal Tort Claims Act (FTCA) for the tortious acts and omissions of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

66.      Pursuant to 28 U.S.C. § 2675(a), a claimant must tender an administrative claim to the federal government before filing suit under the FTCA.

67.      At all times relevant to this Complaint, ICE officials acted within the scope of their employment and/or their official duties as employees of ICE, an agency of the federal government.

68.      On January 3, 2024, Mr. Sayad filed an FTCA administrative claim with ICE for the tortious actions alleged above and committed by ICE officers and officials.

69.      On December 4, 2024, ICE denied the claim.

70.      Mr. Sayad has administratively exhausted his claim under the FTCA.

## V.      CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligent Placement in Segregated Confinement**

71.      Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

72.      Under Arizona law, negligence requires a showing that there was (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard; (3) proximate cause between the breach and the resulting injury; and (4) actual damages.  *CVS Pharmacy, Inc. v. Bostwick ex rel. County of Pima*, 494 P.3d 572, 578 (Ariz. 2021).

73.      Arizona law recognizes that public policy requires a duty of care "in situations involving involuntary detainment or commitment." *J.P. v. United States*, 679 F. Supp. 3d 911,

930 (D. Ariz. 2023) (citing *Demontiney v. Desert Manor Convalescent Center, Inc.*, 695 P.2d 255 (Ariz. 1985)).  Thus, the government owes a duty of care to those individuals in its custody.

74.    ICE employees, including Chief Officer McGregor and others, are responsible for supervising and managing detained individuals at ICE detention facilities, and had a duty under Arizona law to ensure that the terms of Mr. Sayad's confinement were consistent with ICE policy and the U.S. Constitution.  At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

75.    ICE policy, including the Performance Based National Detention Standards (PBNDS), requires that classification of detainees be based on "objective, credible evidence documented in the detainee's A-file, work folders, ICE automated records systems, criminal history checks, or other objective sources of information."  U.S. Immigration and Customs Enforcement, Performance Based National Detention Standards 2011, 62 (Revised 2016).

76.    The Performance Based National Detention Standards also require that classification decisions be "provided to the detainee along with information on the appeal process in a language and manner understood by the detainee."  Performance Based National Detention Standards 2011, 66 (Revised 2016).

77.    A detainee may not be placed in administrative segregation, the practice of moving a detainee into more restricted conditions of confinement, on the sole basis of their religion.  Performance Based National Detention Standards 2011, 175 (Revised 2016).

78.    ICE employees breached their duties to Mr. Sayad when they reclassified Mr. Sayad as a "high class" detainee without any objective documentary basis (and indeed, solely due to Mr. Sayad's religious practices), and when ICE officers failed to effectively notify Mr. Sayad of the appropriate procedure to challenge his classification.  ICE's inconsistent explanations for Mr. Sayad's reclassification and segregation in the medical unit, void of any required supporting documentation, strongly suggest that these explanations were pretextual.

79.    Despite numerous requests from his then-counsel for clarification and a method to challenge his classification and improper confinement in the medical unit, ICE employees, including ICE officer Christopher Miller, failed to meet the standard of care in communicating

the appeal process to Mr. Sayad, at times ignoring emails from his then-counsel, and in doing so, prolonged his unlawful solitary confinement.

80.    This breach caused Mr. Sayad severe emotional, psychological, and dignitary harms, and ultimately led him to go on a hunger strike in protest.

## SECOND CLAIM FOR RELIEF

**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligence in Continuing to Segregate Mr. Sayad Against ICE Guidelines**

81.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.    Under Arizona law, negligence requires a showing that there was (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard; (3) proximate cause between the breach and the resulting injury; and (4) actual damages.  *CVS Pharmacy, Inc. v. Bostwick ex rel. County of Pima*, 494 P.3d 572, 578 (Ariz. 2021).

83.    Arizona law recognizes that public policy requires a duty of care "in situations involving involuntary detainment or commitment."  *J.P. v. United States*, 679 F. Supp. 3d 911, 930 (D. Ariz. 2023) (citing *Demontiney v. Desert Manor Convalescent Center, Inc.*, 695 P.2d 255 (Ariz. 1985)).

84.    ICE employees, including Chief Officer McGregor, are responsible for supervising and managing detained individuals at ICE detention facilities and had a non-delegable duty under Arizona law to ensure that Mr. Sayad received appropriate, competent medical care at LPCC.  At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

85.    Upon information and belief, ICE Health Services Corp is the primary entity tasked with providing and supervising medical care to individuals detained in ICE custody, and its employees are responsible for ensuring that detainees in ICE custody receive medical care that comports with medical guidelines.

86.     Upon information and belief, ICE Health Services Corp employees supervised, directed, and/or provided the healthcare services at LPCC and EDC during the time that Mr. Sayad was detained in those facilities.

87.     ICE Health Services Corp employees were responsible for ensuring that contracting detention facilities complied with all appropriate ICE policies and regulations, including the Performance Based National Detention Standards (PBNDS).  ICE Health Services Corp's website states that it "oversees compliance with medical detention standards."

88.     The PBNDS sets out firm, non-discretionary requirements for providing medical care to ICE detainees and on the use of force in providing medical care to a detainee on a hunger strike.

89.     The PBNDS provides that detainees "on a hunger strike shall be removed from segregation if IHSC or facility medical staff determine that the segregation placement has resulted in deterioration of the detainee's medical or mental health."  Performance Based National Detention Standards 2011, 182 (Revised 2016).

90.     Mr. Sayad and his attorneys repeatedly explained that his hunger strike was a direct result of his segregation in the medical unit, and ICE employees were aware that his physical and mental health were deteriorating because of his segregation in the medical unit. ICE had a duty under these standards to consider moving Mr. Sayad to an appropriate alternative housing accommodation, and they did not.  This failure to consider taking remedial action on Mr. Sayad's classification and segregation constituted a breach of those employees' duties to provide Mr. Sayad with appropriate care that comports with these standards.

91.     This breach caused Mr. Sayad severe emotional, psychological, and dignitary harms, prolonged his hunger strike, and thus caused and exacerbated Mr. Sayad's physical injuries.

## THIRD CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligent Administration of Force-Feeding Procedure

92. Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

93. Under Arizona law, negligence requires a showing that there was (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard; (3) proximate cause between the breach and the resulting injury; and (4) actual damages. *CVS Pharmacy, Inc. v. Bostwick ex rel. County of Pima*, 494 P.3d 572, 578 (Ariz. 2021).

94. Arizona law recognizes that public policy requires a duty of care "in situations involving involuntary detainment or commitment." *J.P. v. United States*, 679 F. Supp. 3d 911, 930 (D. Ariz. 2023) (citing *Demontiney v. Desert Manor Convalescent Center, Inc.*, 695 P.2d 255 (Ariz. 1985)).

95. ICE employees, including Chief Officer McGregor, were responsible for supervising and managing detained individuals at ICE detention facilities and had a non-delegable duty under Arizona law to ensure that Mr. Sayad received appropriate, competent medical care at LPCC. At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

96. Upon information and belief, ICE Health Services Corp is the primary entity tasked with providing and supervising medical care to individuals detained in ICE custody, and its employees are responsible for ensuring that detainees in ICE custody receive medical care that comports with medical and detention guidelines.

97. ICE, in pursuing the TRO that ultimately allowed for Mr. Sayad's force feeding, retained a further duty to take reasonable steps to ensure that Mr. Sayad received competent medical care that comported with the terms of the TRO and ICE policies, and its employees failed to do so.

98. Healthcare providers, under the supervision of ICE Health Services Corp employees or ICE Health Services Corp employees themselves, improperly used the court order

COMPL.                                    -19-                        CASE NO. 3:25-CV-04679

to threaten Mr. Sayad and coerce him to eat solid food before he was ready, violated medical standards for reintroducing food after a period of prolonged starvation, and put him at risk of life-threatening complications.

99.     ICE Health Services Corp had a duty to ensure that any use of force to administer involuntary medical care was documented appropriately, medically necessary, and used as a last resort.  Mr. Sayad's botched nasogastric tube insertion occurred when it was not medically necessary to force feed him; he had been consuming food voluntarily, had been gradually gaining weight, and was willing to consume a variety of liquid and pureed foods.  Mr. Sayad was nonetheless subjected to a traumatic, intrusive, and medically unnecessary procedure that caused lasting injuries.

100.     A supervising officer or healthcare professional exercising reasonable care would have known, or should have known, that LPCC staff were misusing the TRO to threaten and bully Mr. Sayad into consuming food when it was not medically necessary or safe to do so.  ICE employees' failures to intervene on Mr. Sayad's behalf despite clear signs of abuse constitute a breach of their nondelegable duties to Mr. Sayad.

101.     ICE policy also requires facilities to "provide appropriate interpretation and language services for LEP detainees related to medical and mental health care," Performance Based National Detention Standards 2011, 264 (Revised 2016), and separately requires that facilities provide language assistance for detainees on hunger strikes.  Performance Based National Detention Standards 2011, 253 (Revised 2016).

102.     ICE employees were aware, through conversations with Mr. Sayad and his counsel, and through court filings, that Mr. Sayad required the use of an interpreter to effectively communicate with English-speaking staff.  Yet, at many points, including when Mr. Sayad was attempting to explain his reasons for refusing to eat the solid food on March 16, 2022, before the unsuccessful force-feeding attempt(s), Mr. Sayad pleaded with staff to provide an interpreter and was denied one.

103.     A supervising officer or healthcare professional exercising reasonable care would have known, or should have known, that LPCC staff were inconsistently providing

interpretation services to Mr. Sayad, violating ICE policy and putting Mr. Sayad at an unreasonable risk of bodily harm due to his fragile state and his inability to communicate with the providers charged with caring for him. ICE employees breached their duties to Mr. Sayad by failing to take adequate steps to ensure that Mr. Sayad received appropriate interpretation services in communicating with healthcare professionals about his re-feeding.

104.    Mr. Sayad has suffered severe emotional, psychological, and physical injuries because of the government's negligence, in addition to economic harm. These injuries include severe nerve pain, loss of feeling and nearly all function in his left hand, rheumatism, lower back pain, chest pain, chronic insomnia, depression, and speaks with a stammer, many of which were caused or exacerbated by the force-feeding attempt.

### FOURTH CLAIM FOR RELIEF

**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligence in Failing to Transfer Mr. Sayad to a Properly-Equipped Facility**

105.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

106.    Under Arizona law, negligence requires a showing that there was (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard; (3) proximate cause between the breach and the resulting injury; and (4) actual damages. *CVS Pharmacy, Inc. v. Bostwick ex rel. County of Pima*, 494 P.3d 572, 578 (Ariz. 2021).

107.    Arizona law recognizes that public policy requires a duty of care "in situations involving involuntary detainment or commitment." *J.P. v. United States*, 679 F. Supp. 3d 911, 930 (D. Ariz. 2023) (citing *Demontiney v. Desert Manor Convalescent Center, Inc.*, 695 P.2d 255 (Ariz. 1985)).

108.    ICE employees, including Chief Officer McGregor, were responsible for supervising and managing detained individuals at ICE detention facilities and had a non-delegable duty under Arizona law to ensure that Mr. Sayad received appropriate, competent medical care at LPCC. At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

109.    Upon information and belief, ICE Health Services Corp is the primary entity tasked with providing and supervising medical care to individuals detained in ICE custody, and its employees are responsible for ensuring that detainees in ICE custody receive medical care that comports with medical and detention guidelines.

110.    ICE, in pursuing the TRO that authorized Mr. Sayad's force feeding only upon medical necessity, retained a further duty to take reasonable steps to ensure that Mr. Sayad received competent medical care that comported with the terms of the TRO and ICE policies, and its employees failed to do so.  This includes placing him at a facility that was equipped to reintroduce food to Mr. Sayad in a manner that comported with the standard of care.

111.    LPCC did not have the infrastructure to adequately administer Mr. Sayad's re-introduction to food.  LPCC did not have the ability to procure daily, same-day lab tests and results, and did not have a dietician on staff or available to consult with LPCC on the reintroduction of solid food.  This failure violated established medical standards, put Mr. Sayad at a heightened risk of refeeding syndrome, and caused him unnecessary pain and suffering.

112.    ICE policy provides that once it is determined that a detainee's health care needs are "beyond facility resources," the detainee "shall be transferred in a timely manner to an appropriate facility."  Performance Based National Detention Standards 2011, 258 (Revised 2016).  And when a detainee is transferred, ICE requires that facilities provide a plan for continuity of medical care.  *Id*. at 276.  Yet, following the botched nasogastric tube procedure, ICE personnel negligently transferred Mr. Sayad to a facility with even *fewer* resources to meet Mr. Sayad's needs.  In addition to not having on site laboratory testing or a dietitian on staff, Eloy Detention Center did not even have the means to continue Mr. Sayad's liquid diet, causing him extreme pain and to ultimately resume refusing food entirely.

113.    ICE employees were aware of LPCC and EDC's shortcomings.  Indeed, Mr. Sayad was hospitalized five times during his hunger strike, at times for procedures as basic as administering an IV.  Despite LPCC's inability to perform non-routine medical care, ICE employees knowingly authorized facility personnel to attempt a forced nasogastric tube insertion in contravention of the standard of care.

114.    ICE's failure to place Mr. Sayad at an appropriate facility constitute a breach of its duties to Mr. Sayad, caused him profound pain and suffering, ongoing psychological trauma, and possible permanent injury to his arm and hand, in addition to economic damage.  Mr. Sayad also suffers from severe nerve pain, rheumatism, lower back pain, chest pain, chronic insomnia, depression, and speaks with a stammer, all of which were caused by negligence on the part of ICE employees.

### FIFTH CLAIM FOR RELIEF

**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligence in Failing to Provide Emergency Health Services to Mr. Sayad**

115.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    Under Arizona law, negligence requires a showing that there was (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of that standard; (3) proximate cause between the breach and the resulting injury; and (4) actual damages.  *CVS Pharmacy, Inc. v. Bostwick ex rel. County of Pima*, 494 P.3d 572, 578 (Ariz. 2021).

117.    Arizona law recognizes that public policy requires a duty of care "in situations involving involuntary detainment or commitment." *J.P. v. United States*, 679 F. Supp. 3d 911, 930 (D. Ariz. 2023) (citing *Demontiney v. Desert Manor Convalescent Center, Inc.*, 695 P.2d 255 (Ariz. 1985)).

118.    ICE employees, including Chief Officer McGregor, were responsible for supervising and managing detained individuals and contractors at ICE detention facilities and had a non-delegable duty under Arizona law to ensure that Mr. Sayad received appropriate, competent medical care at LPCC.  At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

119.    Upon information and belief, ICE Health Services Corp is the primary entity tasked with providing and supervising medical care to individuals detained in ICE custody, and its employees are responsible for ensuring that detainees in ICE custody receive medical care that comports with medical and detention guidelines.

120.    ICE policies require that twenty-four hour emergency medical services shall be available to all detainees. Performance Based National Detention Standards 2011, 258 (Revised 2016).

121.    Each facility is also required to have a written emergency services plan for delivery of emergency health services, which must include security procedures "to ensure the immediate transfer of detainees for emergency medical care." Performance Based National Detention Standards 2011, 272 (Revised 2016).

122.    Following the botched nasogastric tube procedure, Mr. Sayad complained of hand contracture, a symptom that indicated a possible neurological event, broken bone, or compressed nerve. ICE employees did not take any steps to procure emergency medical care for Mr. Sayad, in violation of medical and detention standards.

123.    In failing to provide emergency care for Mr. Sayad, ICE employees breached their duties to Mr. Sayad, leading to possibly permanent nerve damage and loss of function in Mr. Sayad's left hand. Their conduct has caused significant physical harm, emotional trauma, and economic damages.

### SIXTH CLAIM FOR RELIEF
### 28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligent Infliction of Emotional Distress

124.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    In Arizona, a defendant may be liable for the tort of negligent infliction of emotional distress when (i) the defendant was negligent; (ii) the defendant's negligence created an unreasonable risk of bodily harm to the plaintiff; (iii) the defendant's negligence caused the plaintiff emotional distress; and (iv) the plaintiff suffered physical injury or illness due to the emotional distress. *Kretsch v. Barton*, No. CV-23-00411-PHX-ROS, 2024 WL 962181, at *8 (D. Ariz. Mar. 6, 2024)(citing *Quinn v. Turner*, 745 P.2d 972, 972 (Ariz. Ct. App. 1987)).

126.    ICE was negligent in its decision to allow Mr. Sayad to be reclassified as a "high class" detainee without any objective documentation, in direct conflict with ICE policies.

127.    ICE also improperly confiscated Mr. Sayad's personal items, several of which were required for Mr. Sayad to practice his faith and negligently failed to return them.

128.    ICE failed to ensure that Mr. Sayad's reintroduction to food comported with medical guidelines, including attempts to use force to administer a nasogastric tube when it was not medically necessary, and in doing so, created an unreasonable risk of bodily harm to Mr. Sayad.

129.    ICE's failures to follow medical and detention guidelines caused Mr. Sayad significant emotional distress, which persists to this day.  For months after the procedure, Mr. Sayad would cower when ICE officials and medical personnel would examine him and perform routine medical care.

130.    Mr. Sayad's emotional distress has caused him physical injury and illness. Specifically, Mr. Sayad takes anxiety medication, speaks with a stammer, frequently has trouble breathing, chest pain and tightness, and has memory problems.  These injuries were caused and/or exacerbated by the trauma he experiences as a result of the force-feeding attempt.  He also experiences heightened anxiety around receiving medical care, causing him severe distress around the possibility of needing surgery to rectify the nerve damage in his arm.  This trauma has posed a significant barrier to receiving treatment for his physical injuries.  Mr. Sayad has also suffered economic harm from the alleged conduct.

**SEVENTH CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA – Negligent Supervision**

131.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

132.    Arizona follows the Restatement of Agency's approach to negligent supervision, which provides that a person conducting an activity through an agent is subject to liability if they are negligent or reckless when they (a) give improper or ambiguous orders; (b) employ improper persons or instrumentalities in work involving risk of harm to others; (c) supervise the activity; or (d) permit, or fail to prevent, negligent or other tortious conduct by persons, upon premises or

with instrumentalities under his control.  *See Kassman v. Busfield Enters., Inc.*, 639 P.2d 353, 356 (Ariz. Ct. App. 1981).

133.   ICE employees have a duty to supervise, oversee, monitor, inspect, terminate, discipline, or take other remedial action against its employees, agents, and contractors; and to ensure that ICE agents and contractors comply with its own policies for detaining individuals and providing those detained individuals' appropriate medical care.

134.   ICE employees have a near constant onsite presence at both LPCC and EDC, and play an active role in setting the terms of confinement for detainees at both facilities.

135.   As described in the preceding paragraphs, employees at LPCC, EDC, and ICE employees stationed at both facilities violated numerous ICE standards during Mr. Sayad's detention.  Specifically, they violated ICE's mandatory detention policies when they misclassified Mr. Sayad as a "high class" detainee on a discriminatory basis, failed to communicate the process for appealing that misclassification with Mr. Sayad, segregated Mr. Sayad in the medical unit despite policies requiring that he be moved, failing to provide Mr. Sayad an interpreter when he requested one, attempting to perform a traumatic and non-consensual medical procedure on Mr. Sayad when it was not medically necessary to do so, and failing to transfer Mr. Sayad to a facility with the means to appropriately care for him.

136.   ICE's own website maintains that it ostensibly inspects its contracted facilities for compliance with detention regulations daily and have a policy of routinely auditing facilities for compliance with these requirements.

137.   ICE employees charged with supervising Mr. Sayad's care knew or should have known, through conversations with Mr. Sayad and his counsel, that LPCC and EDC were violating ICE policy in segregating Mr. Sayad in the medical unit, inhibiting the exercise of his religion, and failing to provide adequate language assistance and medical care to Mr. Sayad.  In failing to intervene on his behalf, ICE employees knowingly failed to follow its own mandatory policies in supervising CoreCivic's activities and failed to prevent Mr. Sayad's injuries.

138.   ICE employees' negligence caused Mr. Sayad significant physical and emotional harm and economic damage.

**EIGHTH CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA– False Imprisonment**

139.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140.    Under Arizona law, a false imprisonment claim requires that a person be held "without his consent and without lawful authority." *Slade v. City of Phoenix*, 112 Ariz. 298, 541 P.2d 550, 552 (1975).

141.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

142.    ICE security officers at LPCC improperly moved Mr. Sayad into the medical unit without any legal justification or objective basis. ICE officers' later attempts at explaining the change in Mr. Sayad's status are all inconsistent, post-hoc justifications meant to masquerade the fact that Mr. Sayad was placed into solitary confinement and treated like a criminal because he was attempting to practice his faith, which officers found annoying.

143.    The underlying reason for Mr. Sayad's confinement, animus towards his religion and religious expression, is an affirmatively unlawful basis to reclassify an ICE detainee under both ICE policy and the U.S. Constitution.

144.    Mr. Sayad was aware of his confinement, has suffered significant emotional harm by it, and continues to suffer the consequences from his confinement.

**NINTH CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA– Abuse of Process**

145.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

146.    In Arizona, an abuse of process "is an act done under the authority of the court for the purpose of perpetrating an injustice, i.e., a perversion of the judicial process to the accomplishment of an improper purpose." *Morn v. City of Phx.*, 730 P.2d 873, 876 (Ariz. Ct. App. 1986).

147.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

148.    ICE officers stationed at LPCC sought a TRO to administer involuntary hydration and nutrition to Mr. Sayad, under the rationale that involuntary hydration and nutrition was medically necessary to avoid death or permanent injury to Mr. Sayad.  The TRO reflects this understanding, by describing the medical care allowed to be administered involuntarily as "necessary medical measures."

149.    After ICE officers obtained the TRO to allow for force-feeding, ICE officers used the TRO for an improper purpose—to threaten, bully, and retaliate against Mr. Sayad.  Each time Mr. Sayad resisted eating the food in front of him, ICE officers would threaten Mr. Sayad with the prospect of an invasive, painful procedure to get him to eat more than he could, putting him at risk of dangerous complications and causing extreme pain and distress.

150.    These threats were unnecessary and exceeded the scope of the TRO. Mr. Sayad had communicated at various points that he was willing to eat a variety of liquid and pureed foods, and he had been gaining weight. Mr. Sayad refusing to eat his first solid meal or needing to take more time to complete his meals, did not pose an immediate threat to Mr. Sayad's life or wellbeing in a manner that would justify force feeding under the TRO, or threatening to force feed him in a manner that could lead to dangerous complications.

151.    ICE officers also exceeded their authority in physically restraining Mr. Sayad during the force-feeding attempt(s), as the force-feeding was not medically necessary at that time. The force-feeding attempt was not done in a manner that could reasonably be considered medically appropriate, and was really an effort to punish Mr. Sayad for resisting. This violence was perpetuated for an unlawful purpose, under the authority of the court's TRO.

152.    The alleged conduct caused Mr. Sayad significant physical injury, emotional and psychological harm, and economic damage.

**TENTH CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA – Intentional Infliction of Emotional Distress**

153.    Mr. Sayad repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

154.    Under Arizona law, a defendant is liable for the tort of intentional infliction of emotional distress when (1) their actions were extreme and outrageous, (2) they either intended to cause emotional distress or acted in reckless disregard of that result, and (3) severe emotional distress in fact occurred. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580 (1987) (en banc).

155.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

156.    ICE employees were aware that Mr. Sayad was a devout Muslim, and that practicing his religion faithfully was of great importance to him.

157.    ICE employees confiscated Mr. Sayad's religious items and turned the water off in his cell at various points to induce him to eat, while having no intention of returning his items to him or turning the water on in his cell. ICE employees also told Mr. Sayad that he would be returned to general population housing accommodations after eating a meal, while having no intention of doing so. These actions, taken in context with ICE employees' knowledge of Mr. Sayad's faith and the reasons for his hunger strike, were extreme and outrageous and done with in reckless disregard for the severe emotional distress that it would cause Mr. Sayad.

158.    These actions caused Mr. Sayad extreme emotional distress; his distress was so severe that it led to his hunger strike lasting nearly two months.

**ELEVENTH CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA – Battery**

159.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

160.    Under Arizona law, battery is the intentional infliction of a harmful or offensive contact with another person without lawful justification or consent. *See Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 438 (Ariz. 2003).

161.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

162.    Federal law enforcement officers, including ICE officers and other personnel under ICE supervision, physically restrained Mr. Sayad during an attempted nasogastric tube insertion on March 16, 2022.  This restraint was undertaken without Mr. Sayad's consent and was not medically necessary at the time, thus exceeding the scope of the TRO authorizing the government to administer nutrition involuntarily.  Mr. Sayad was gaining weight, and consuming food voluntarily.

163.    Continuing to hold Mr. Sayad down through not one but *five* failed attempts to insert the nasogastric tube also exceeded the scope of any authority granted to the government to administer involuntary medical care.

164.    The physical force used against Mr. Sayad to hold him down, in addition to the insertion, caused significant pain, bleeding, lasting nerve damage in his arm, and emotional trauma.  This conduct constitutes battery under Arizona law.

165.    The alleged conduct caused Mr. Sayad significant physical injury, emotional and psychological harm, and economic damage.

### TWELFTH CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – FTCA – Medical Battery

166.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

167.    Medical battery under Arizona law occurs where (1) no consent is given for the treatment; or (2) the treatment provided exceeds the scope of the patient's consent.  See *Duncan*, 70 P.3d at 438–39.

168.    The medical staff at LPCC, in conjunction with ICE law enforcement officers, forcibly inserted a nasogastric tube into Mr. Sayad's nose five times without valid consent, despite his clear objections and fragile medical condition.

169.     The nasogastric tube, in being medically unnecessary and not conducted through competent medical personnel, exceeded the scope of any lawful authority to administer involuntary medical care to Mr. Sayad under the TRO.

170.     The physical force used against Mr. Sayad to hold him down, in addition to the insertion, caused significant pain, bleeding, lasting nerve damage in his arm, and emotional trauma and economic damage.  This conduct constitutes medical battery under Arizona law.

### THIRTEENTH CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – FTCA – Aiding and Abetting Battery

171.     Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

172.     Under Arizona law, a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person.  *See Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 23 (Ariz. 2002).

173.     Claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.  *Wells Fargo Bank*, 38 P.3d at 23.

174.     ICE law enforcement officers who physically restrained Mr. Sayad provided substantial assistance to medical personnel in conducting a medically unnecessary and harmful procedure.  These officers were aware that the procedure lacked proper consent, was not medically necessary at the time, and was likely to cause harm.

175.     In holding Mr. Sayad down despite his clear resistance, these officers aided and abetted the underlying battery against Mr. Sayad by Dr. Robertson and other medical personnel at LPCC, and are thus liable under Arizona tort law.

176.     The physical force used against Mr. Sayad to hold him down, in addition to the resulting insertion, was done without Mr. Sayad's consent and exceeded the narrow scope of the

TRO's authorization.  This force caused significant pain, bleeding, lasting nerve damage in his arm, and emotional trauma and economic damage.  This conduct constitutes medical battery under Arizona law.

### FOURTEENTH CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – FTCA – Assault

177.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178.    Under Arizona law, assault is an intentional act that creates a reasonable apprehension in another of imminent harmful or offensive contact.  *See Garcia v. United States*, 826 F.2d 806, 809 n.9 (9th Cir. 1987) (citing the Second Restatement of Torts §21).

179.    ICE personnel acting within the scope of their employment at DHS repeatedly threatened Mr. Sayad with forced feeding, including nasogastric tube insertion, while he was in a fragile medical condition and without explaining the procedures or providing interpretation services.  Mr. Sayad reasonably anticipated the imminent use of force, which was confirmed by prior threats and carried out through physical acts of restraint.  The fear created by these personnel's actions caused Mr. Sayad significant emotional distress.

### FIFTEENTH CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – FTCA – Civil Conspiracy

180.    Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.    In Arizona, civil conspiracy requires (1) an agreement between two or more parties, (2) to accomplish an unlawful purpose or a lawful purpose by unlawful means, and (3) an overt act in furtherance resulting in damages.  *See Dawson v. Withycombe*, 163 P.3d 1034, 1052 (Ariz. Ct. App. 2007).

182.    ICE officials and medical staff at LPCC acted in concert to punish Mr. Sayad's resistance to reintroducing solid foods on their arbitrary and rushed timeline.  ICE officials and medical staff at LPCC together pursued refeeding Mr. Sayad by unlawful means when they

exceeded the narrow scope of the TRO's authorization by providing involuntary feeding that was not medically necessary.  This was a civil conspiracy to engage in unlawful conduct including abuse of process and intentional infliction of emotional distress.

183.    Additionally, ICE officials and LPCC staff together took steps to threaten Mr. Sayad with the nasogastric tube, and ultimately subject him to an excruciating, medically unnecessary procedure.  This was a civil conspiracy to engage in unlawful conduct, including acts constituting assault and the intentional infliction of emotional distress.

184.    Then, ICE officials and LPCC staff acted in concert to physically restrain Mr. Sayad through numerous, repeated attempts to insert the nasogastric tube, without Mr. Sayad's consent and beyond the scope of court authorization.  This was a civil conspiracy to engage in unlawful conduct, including battery, medical battery, and the intentional infliction of emotional distress.

185.    As a result of the civil conspiracies alleged herein, Plaintiff suffered significant harm, including but not limited to physical injury, emotional distress, and economic damage.

## VI.    PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

(1) Enter judgment in favor of Mr. Sayad with respect to the foregoing causes of action, and declare that Defendant's actions were unlawful;

(2) Award Mr. Sayad compensatory damages in an amount to be determined at trial;

(3) Require Defendant to pay Mr. Sayad's reasonable fees, costs, and expenses, including attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and as otherwise may be available; and

(4) Grant such other relief as the Court deems just and equitable.

Date: June 3, 2025                              By: */s/ Yaman Salahi*

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (*pro hac vice* forthcoming)*
nicolec@salahilaw.com
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, California 94111

Tel: (415) 236-2352
* Admitted to practice in Pennsylvania only

Amria Ahmed (SBN 263389)
amria@araborganizing.org
Arab Resource and Organizing Center
522 Valencia St.
San Francsico, CA 94110
Tel: (415) 861-7444

*Counsel for Plaintiff*